UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL JOSEPH RHINEHART,

          Plaintiff,

    v.

HEDGPETH, et al.,

          Defendants.

Case No. 15-cv-01699-JST

**ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT; STAYING ACTION AND REFERRING TO SETTLEMENT PROCEEDINGS; DIRECTIONS TO CLERK**

Re: ECF No. 21

### INTRODUCTION

Plaintiff, a California prisoner currently incarcerated at California State Prison – Los Angeles, filed this pro se civil rights action under 42 U.S.C. § 1983 alleging that prison officials at Salinas Valley State Prison ("SVSP"), where he was previously incarcerated, violated his rights under the Equal Protection Clause when, on May 11, 2012, they placed him on modified programs due to his race. Now before the Court is Defendants' motion for summary judgment. ECF No. 21. Plaintiff has filed an opposition, ECF No. 34; Defendants have filed a reply, ECF No. 36, and Plaintiff has filed a sur-reply with leave of court.[1] For the reasons set forth below, Defendants'

---

[1] Defendants have also filed objections to evidence submitted in support of the opposition, ECF No. 37, and objections to evidence filed in support of the sur-reply, ECF No. 46. Specifically, Defendants object that certain statements made by Plaintiff in his opposition and his sur-reply are inadmissible. See generally ECF Nos. 37 and 46. The Court has considered these objections in deciding the summary judgment motion. The Court notes that, at the summary judgment stage, the focus is not on the admissibility of the evidence's form, but rather the admissibility of its contents. Block v. City of Los Angeles, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."); see also Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.") (internal quotation marks and citation omitted).

United States District Court
Northern District of California

summary judgment motion is GRANTED IN PART AND DENIED IN PART.

<div align="center">BACKGROUND</div>

I.      **PARTIES TO THE ACTION**

    A.      **Plaintiff**

During the relevant time period, Plaintiff was classified as an "inactive" Black Guerilla Family prison gang member and a level-four inmate.  ECF No. 22 ("Asuncion Decl.") ¶ 2; ECF No. 23 ("Hedgpeth Decl.") ¶ 2; ECF No. 24 ("Valdez Decl.") ¶ 5.  Level-four inmates are assigned to housing facilities with the highest level of security.  Asuncion Decl. ¶ 2.  Plaintiff arrived at SVSP on July 8, 2010 and departed on October 28, 2013.  ECF No. 34 at 5.  During the relevant time period, Plaintiff was housed in SVSP's Facility B.[2]  Hedgpeth Decl. ¶ 4.

On May 11, 2012, Plaintiff was subject to two separate modified programs because the modified programs affected Black inmates and Plaintiff is a Black inmate.  ECF No. 34 at 5. Plaintiff was not placed on the modified program because of any specific actions taken by him or because he was known to be an inmate likely to engage in violence.  ECF No. 34 at 5.  While subject to the modified program, Plaintiff's outdoor exercise and other privileges were suspended while non-Black inmates were allowed to participate in outdoor exercise and provided their privileges.  ECF No. 34 at 5.

While housed at SVSP Facility B, Plaintiff was never involved in any violence, and was never approached by other inmates to participate in violence against correctional officers or other inmates.  ECF No. 34 at 5.  Plaintiff was deeply offended by being placed on a modified program along with all other Black inmates.  ECF No. 34 at 5.  Plaintiff states that he considered the modified program racial discrimination, and that this discrimination caused him mental anguish and depression.  ECF No. 34 at 5.

    B.      **Defendants**

Defendant Asuncion is currently Acting Warden at California State Prison – Los Angeles

---

[2] Defendants allege that Facility B is level-four, maximum-security housing, Hedgpeth Decl. ¶ 4, but Plaintiff challenges this allegation as untrue and alleges that SVSP Facility C and D are at "higher levels."  ECF No. 34 at 15.

<div style="writing-mode: vertical-rl">United States District Court<br/>Northern District of California</div>

County.  Asuncion Decl. ¶ 1.  From June 2011 to March 2013, Defendant Asuncion was facility captain for SVSP's Facility B.  Asuncion Decl. ¶ 1.  In this capacity, Defendant Asuncion planned, organized, and directed a program for the custody, security, discipline, classification, organizing, treatment, employment, and recreation of Facility B inmates.  Asuncion Decl. ¶ 1.

Defendant Hedgpeth worked for the California Department of Corrections and Rehabilitation ("CDCR") from May 26, 1981 to June 30, 2012, serving at numerous prisons throughout the CDCR[3] and in various positions.[4]  Hedgpeth Decl. ¶ 1.  Defendant Hedgpeth served as Acting Warden at SVSP from January 1, 2012 to June 30, 2012.  Hedgpeth Decl. ¶ 1. Defendant Hedgpeth retired from the CDCR on December 30, 2011, and returned as a retired annuitant from January 1, 2012 to June 30, 2012.  Hedgpeth Decl. ¶ 1.  After June 30, 2012, Defendant Hedgpeth had no responsibility or authority at SVSP or at any other CDCR facility. Hedgpeth Decl. ¶ 1.

Sergeant Valdez was assigned to SVSP's Institutional Gang Investigation Unit ("IGI") from January 2002 to November 2014, and as of June 2016, was assigned to SVSP's Security Squad.  Valdez Decl. ¶ 1.

## II.  GANGS WITHIN CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

The majority of the gangs found within the CDCR are either prison gangs or disruptive groups.  Prison gangs originated within the prison system, and disruptive groups began outside the prison in local communities.  Asuncion Decl. ¶¶ 21, 25; Hedgpeth Decl. ¶¶ 29–31; Valdez Decl. ¶¶ 10, 11.  Prison gangs and disruptive groups are powerful and violent criminal organizations and commit a significant portion of all criminal activity at SVSP and other CDCR prisons.  Hedgpeth Decl. ¶ 29; Valdez Decl. ¶ 10.  These groups are often organized according to racial or ethnic bonds, geographic origin, or street-gang membership.  Hedgpeth Decl. ¶ 29; Valdez Decl. ¶ 9.

---

[3] During his time at the CDCR, Defendant Hedgpeth worked at Correctional Training Facility, California Correctional Institution, Wasco State Prison, Kern Valley State Prison, and SVSP. Hedgpeth Decl. ¶ 1.

[4] During his time at the CDCR, Defendant Hedgpeth served as a correctional officer, sergeant, lieutenant, captain, associate warden, chief deputy warden, and warden.  Hedgpeth Decl. ¶ 1.

United States District Court
Northern District of California

1    In both Defendant Hedgpeth's experience and Sgt. Valdez's experience, most prison

2  violence is caused by feuds between prison gangs and disruptive groups, and not because of

3  grievances between individuals.  Hedgpeth Decl. ¶ 29; Valdez Decl. ¶ 9.

4    The CDCR recognized six prison gangs during the relevant time period:  Mexican Mafia,

5  Nuestra Familia; Aryan Brotherhood; Nazi Lowriders; Black Guerilla Family; and Northern

6  Structure.  Asuncion Decl. ¶ 22; Hedgpeth Decl. ¶ 30; Valdez Decl. ¶ 10.  Disruptive groups often

7  form symbiotic relationships with one of the six recognized prison gangs.  Hedgpeth Decl. ¶ 31;

8  Valdez Decl. ¶ 10.

9    Two of the largest street gangs in CDCR prisons were the Bloods and the Crips.  Asuncion

10  Decl. ¶ 22; Valdez Decl. ¶ 13.  Ethnically, Blood and Crip membership was compromised of

11  predominantly Black individuals.  Asuncion Decl. ¶ 22; Valdez Decl. ¶ 13.  It was not possible for

12  prison officials to determine which group an inmate belonged to based solely on an inmate's

13  hometown because gang-membership often crossed regional and national boundaries.  Hedgpeth

14  Decl. ¶ 32; Valdez Decl. ¶ 13.  Generally, inmates who were affiliated with the Crips and the

15  Bloods were unwilling to self-identify as members of these disruptive groups, making it difficult

16  for staff to identify inmates associated with disruptive groups and to conduct modified program

17  investigations.  Asuncion Decl. ¶ 25; Hedgpeth Decl. ¶ 33; Valdez Decl. ¶ 13.  Unidentified gang

18  members were often able to act on behalf of the gang undetected and sometimes avoided being

19  placed on modified programs that affected their gang.  Asuncion Decl. ¶ 22; Hedgpeth Decl. ¶ 33;

20  Valdez Decl. ¶ 13.

21    Another street gang that was organized and influential in SVSP was the "Northern

22  Hispanics."  Asuncion Decl. ¶¶ 29, 32; Hedgpeth Decl. ¶ 35; Valdez Decl. ¶ 17.  The membership

23  of the Northern Hispanic disruptive group was primarily ethnically Hispanic inmates from

24  Northern California.  Asuncion Decl. ¶ 30; Valdez Decl. ¶ 17.  The Northern Hispanic disruptive

25  group had its own constitution; was structured like a military organization; and assigned specific

26  duties to its members, associates, and subordinates.  Asuncion Decl. ¶ 29; Hedgpeth Decl. ¶ 34;

27  Valdez Decl. ¶ 17.  The "Northern Hispanic" label was not used as a racial or ethnic label.

28  Asuncion Decl. ¶ 30; Valdez Decl. ¶ 17.  Rather, "Northern Hispanic" referred to a class of

United States District Court
Northern District of California

4

1    inmates who chose to adhere to a particular gang ideology, regardless of the inmate's ethnicity.

2    Asuncion Decl. ¶ 30; Valdez Decl. ¶ 17.  Inmates of non-Hispanic inmates also chose to affiliate

3    with the Northern Hispanics.  Valdez Decl. ¶ 18.

4          In both Defendant Hedgpeth's experience and Sgt. Valdez's experience, a gang's

5    leadership used its power to coerce other inmates to follow its orders.  Hedgpeth Decl. ¶ 36;

6    Valdez Decl. ¶ 23.  At SVSP, gang leadership would directly or indirectly order inmates, even

7    those unaffiliated with gangs, to attack staff and other inmates.  Hedgpeth Decl. ¶ 36; Valdez

8    Decl. ¶ 23.  Inmates who refused the gang's demands sometimes faced violent retaliation.

9    Hedgpeth Decl. ¶ 36; Valdez Decl. ¶ 23.

10          According to Sgt. Valdez, black inmates would often be coerced to participate, or

11    volunteer to participate, in criminal activity in support of the Bloods or the Crips, both of which

12    were comprised predominantly of Black individuals.  Valdez Decl. ¶¶ 13–16.  Sgt. Valdez also

13    stated that Black inmates almost always set aside conflicts to help other Black inmates during a

14    group disturbance or riot between different races.  Valdez Decl. ¶ 15.  Black inmates would

15    typically physically assault another Black inmate, whether affiliated or unaffiliated, who failed to

16    "help" or participated during a group disturbance with other races.  Valdez Decl. ¶ 15.  Moreover,

17    during a feud with another inmate group, such as the Northern Hispanics, Black inmates would be

18    expected to attack a member of that group first, and not wait to be attacked.  Valdez Decl. ¶ 15.

19          According to Sgt. Valdez, typically Hispanic inmates placed their gang or disruptive group

20    ties above race, unlike Black inmates.  Valdez Decl. ¶ 15.  Defendants stated that it was extremely

21    difficult for non-affiliated Hispanic inmates to avoid pervasive threats and coercion from the

22    Northern Hispanic and Southern Hispanic disruptive groups.  Asuncion Decl. ¶ 32; Hedgpeth

23    Decl. ¶ 35; Valdez Decl. ¶¶ 17, 22.  Nearly all of the unaffiliated Hispanic inmates — who were

24    not affiliated with Fresno Bulldogs or Mexican Nationals — were subjected to attempts by the

25    Northern Hispanics and Southern Hispanic disruptive groups to intimidate and control them.

26    Valdez Decl. ¶ 22.

27    **III.    MODIFIED PROGRAMS**

28          On or around May 2012, section 3000 of the California Code of Regulations, title 15

1  provided for the implementation of "modified programs:"

> Modified Program means the suspension or restriction of less than all inmate program activities and/or movement. A Modified Program may either occur independently in response to an incident or unusual occurrence or may occur as a facility transitions from a lockdown to regular programming. Imposed restrictions may fluctuate as circumstances dictate with the goal of resuming regular programming as soon as it is practical. Modified programming will last no longer than necessary to restore institutional safety and security or to investigate the triggering event, and shall not target a specific racial or ethnic group.  For those inmates whose movement has been restricted, movement may be authorized on a case-by-case basis for essential or emergency services such as medical, dental, mental health or law library visits. The routine and/or temporary restrictions on inmate movement or yard activities, which do not last longer than 24 hours, are not considered a program modification.

Cal. Code Regs. tit. 15, § 3000.  All modified programs required the warden's approval.  Asuncion Decl. ¶ 7; Hedgpeth Decl. ¶ 13.

### A.    Objectives

The decision to implement modified programs was based on the safety and security needs of the institution.  Asuncion Decl. ¶ 6.  Modified programs were typically implemented in response to violence or potential violence, and often were implemented after incidents involving either a significant number of inmates, violence between two different inmate groups, or threats to staff.  Asuncion Decl. ¶ 6; Hedgpeth Decl. ¶ 7.  A majority of modified programs were implemented in response to gang-related activity.  Asuncion Decl. ¶ 21.  The objective of a modified program was to safely return a facility back to a normal program without a security breach.  Asuncion Decl. ¶ 7.  Modified programs remained in effect until staff completed their investigation of the violent incident that triggered the modified program.  Asuncion Decl. ¶ 7. Modified programs could apply to all inmates or just a group of inmates.  Asuncion Decl. ¶ 7.

### B.    Restriction on Inmate Activities

Modified programs restricted inmate privileges and inmate movement to safeguard the security and safety of inmates and staff.  Asuncion Decl. ¶ 7.  Inmates' access to outdoor exercise, visiting, quarterly packages, or canteen could be limited or suspended during a modified program. Asuncion Decl. ¶ 7.

### C.    Custodial Staff Duties During Modified Programs

Modified programs require additional duties of custodial staff.  Asuncion Decl. ¶¶ 85, 85;

6

Hedgpeth Decl. ¶ 27.  Custodial staff from the impacted facility must investigate each modified program by conducting inmate-interviews, facility-wide searches, document review, and other work necessary to safely return the facility to a normal program.  Asuncion Decl. ¶ 85; Hedgpeth Decl. ¶ 27.  At times, custodial staff from other facilities would assist, but for no more than one or two days.  Asuncion Decl. ¶ 85; Hedgpeth Decl. ¶ 27.

In addition, custodial staff must cell-feed inmates and escort them to obtain medical or dental care.  During a normal program, inmates walk themselves to the dining hall, and are allowed to walk themselves to the medical or dental facility unsearched and unrestrained.  Asuncion Decl. ¶ 86.  During a modified program, custodial staff obtained and delivered meals to each inmate in his or her cell, three times a day, and then retrieved the meal-tray after the meal was completed.  When inmates required medical or dental care, each inmate was escorted one at a time by two officers after being subjected to a clothed-body search and placed in mechanical restraints.  Asuncion Decl. ¶ 86.

### D.    Reporting Requirements

Section 55015 of the CDCR Department Operations Manual ("DOM") is a confidential section of the DOM[5] that was in effect in May 2012 and provided the authority for a modified program.  Asuncion Decl. ¶¶ 8, 87; Hedgpeth Decl. ¶ 8; Valdez Decl. ¶ 27.  Section 55015 also set forth clear guidelines for modified programs, and set forth strict reporting requirements regarding modified programs.  Asuncion Decl. ¶¶ 8, 87; Hedgpeth Decl. ¶ 8; Valdez Decl. ¶ 27.  Section 55015 authorized prison officials to conduct inmate interviews and suspend inmate privileges which investigating the incident that triggered the modified program.  Asuncion Decl. ¶ 8; Valdez Decl. ¶ 27.

If the normal program is modified in any manner, Section 55015 required that staff complete the appropriate portions of the Program Status Report, CDCR Form 3022, for each modified program.  Asuncion Decl. ¶ 8; Hedgpeth Decl. ¶ 12.

At the start, all modified programs required immediate notification from the impacted area

---

[5] Section 55015 is not disclosed to inmates because of the information it contains.  Asuncion Decl. ¶ 8; Hedgpeth Decl. ¶ 8.

United States District Court
Northern District of California

1    by the Watch Commander, or a higher-ranked employee, to the Warden.  Asuncion Decl. ¶ 88;

2    Hedgpeth Decl. ¶ 13.  Within twenty-four hours of a program modification, the Warden was

3    required to verbally notify the appropriate Associate Director at CDCR headquarters, as well as

4    complete and submit CDCR Form 3022, Part A (Initial Notification) to the Associate Director.

5    Asuncion Decl. ¶ 88; Hedgpeth Decl. ¶ 13.  Only the Warden had the authority to implement a

6    modified program.  Asuncion Decl. ¶ 88; Hedgpeth Decl. ¶ 13.

7            Staff were required to create a daily plan of operation for each modified program, which

8    was reported in CDCR Form 3022, Part B (Plan of Operation) and addressed the modified

9    program's costs, duration, affected areas, inmates, critical workers, feeding, medical and mental

10   health services, inmate appointments, showers, religious services, library, visiting, phone calls,

11   recreation, canteen, vendor packages, and disciplinary or classification hearings.  Asuncion Decl. ¶

12   89; Hedgpeth Decl. ¶ 14.  The Warden reviewed the plan of operation on a daily basis and

13   provided this report to the Associate Director.  Asuncion Decl. ¶ 89; Hedgpeth Decl. ¶ 14.

14           Staff were also required to complete CDCR Form 3022, Part C (Weekly Status Report), a

15   weekly status report which included the current plan of operation, described the preceding week's

16   progress, and specified actions taken to attempt to return to a normal program.  Asuncion Decl. ¶

17   90; Hedgpeth Decl. ¶ 15.  This report was also sent to the Associate Director.  Asuncion Decl. ¶

18   90; Hedgpeth Decl. ¶ 15.

19           Staff were also required to complete CDCR Form 3022, Part D (Weekly Status Report –

20   Prison), a weekly status report that identified all modified programs at an institution.  This report

21   was submitted to the Associate Director every week, and was forwarded to the Deputy Director

22   and the Division of Adult Institutions ("DAI") Director.  Asuncion Decl. ¶ 91; Hedgpeth Decl. ¶

23   16.

24           Staff were also required to complete CDCR Form 3022, Part E (Sixty-Day Status Report)

25   every sixty days until the modified program returned to a normal program.  This sixty-day status

26   report included the current plan of operation, and specified actions taken to attempt to return to a

27   normal program.  Asuncion Decl. ¶ 92; Hedgpeth Decl. ¶ 17.  This report was submitted to the

28   Associate Director, who was required to submit it to the Deputy Director and the DAI Director.

United States District Court
Northern District of California

8

Asuncion Decl. ¶ 92; Hedgpeth Decl. ¶ 17.  The DAI Director was required to immediately provide the sixty-day report to the Chief Deputy Secretary of CDCR's Adult Operations. Asuncion Decl. ¶ 92; Hedgpeth Decl. ¶ 17.

In accordance with section 55015, the Warden conducted daily meetings with the Chief Deputy Warden, the Associate Wardens, the Facility Captains from the affected areas, members from the Investigative Services Unit ("ISU") and Institutional Gang Investigation Unit ("IGI"), and other staff members, to address each modified program implemented at SVSP.  Asuncion Decl. ¶ 93; Hedgpeth Decl. ¶ 18.  During these meetings, the Warden was provided investigation results, inmate-interview results, new intelligence, and input from ISU and IGI.  Asuncion Decl. ¶ 93; Hedgpeth Decl. ¶ 18.  Additionally, the staff reviewed the daily plan of operations; developed the plan of operation for the next day; discussed alternatives to the modified programs; and discussed the best way to end the modified programs as quickly as safety would allow.  Asuncion Decl. ¶ 93; Hedgpeth Decl. ¶ 18.

Every week, the Warden conducted a telephone-conference with the CDCR Associate Director.  Asuncion Decl. ¶ 94; Hedgpeth Decl. ¶ 19.  These telephone-conferences were also attended by the Chief Deputy Warden, the Associate Wardens, the Facility Captains from the affected areas, ISU and IGI members and other staff members.  Asuncion Decl. ¶ 94; Hedgpeth Decl. ¶ 19.  During these weekly conferences, staff reported to the Associate Director investigation results, inmate-interview results, new intelligence, and plans to return to normal programming.  Asuncion Decl. ¶ 94; Hedgpeth Decl. ¶ 19.

**E.      Returning to Normal Programming**

CDCR's policy was to return to a normal programming as soon as it was safe to do so. Hedgpeth Decl. ¶ 20; Asuncion Decl. ¶ 16.  In accordance with the obligation to provide safety and security to staff and inmates, staff cautiously restored privileges and incrementally released inmates from the modified program.  Hedgpeth Decl. ¶ 20; Asuncion Decl. ¶ 16.  During a modified program, privileges were restored gradually.  Hedgpeth Decl. ¶ 21; Asuncion Decl. ¶ 17. For example, restrictions on contact-visiting would be lifted for inmates affected by a modified program.  Hedgpeth Decl. ¶ 21; Asuncion Decl. ¶ 17.  If successful, then other inmate privileges

9

1   would be restored in an effort to return to normal programming.  Hedgpeth Decl. ¶ 21; Asuncion

2   Decl. ¶ 17.  Typically, exercise-yard and dayroom privileges were the last privileges to be restored

3   during a modified program because these privileges presented the greatest potential for inmate

4   violence.  Hedgpeth Decl. ¶ 21; Asuncion Decl. ¶ 17.

5          Inmates were carefully chosen to be included in incremental releases.  Staff selected

6   inmates for incremental release that were the least likely to engage in violence.  Asuncion Decl. ¶

7   18; Hedgpeth Decl. ¶ 22; Valdez Decl. ¶ 32.  An inmate's likelihood of engaging in violence was

8   determine by reviewing the inmate's central-files to identify inmates without disciplinary records

9   for violence, without known gang-affiliations, and with very low classification scores.  Asuncion

10  Decl. ¶ 18; Hedgpeth Decl. ¶ 22; Valdez Decl. ¶ 32.  These inmates typically underwent unclothed

11  body searches and were subjected to metal detectors before they were released to the yard.

12  Asuncion Decl. ¶ 18; Hedgpeth Decl. ¶ 22; Valdez Decl. ¶ 32.  Inmates were sometimes

13  incrementally released in groups as small as two or three inmates.  Hedgpeth Decl. ¶ 22.  If

14  successful, larger groups of inmates would be released until all inmates were programming on the

15  yard.  Hedgpeth Decl. ¶ 22.  However, if a violent incident occurred during the incremental

16  release, staff were forced to suspend the released inmates' yard-privileges; stop the incremental-

17  release plan; investigate the violent incident that included inmate interviews; conduct a facility-

18  wide search for weapons and communications; and/or suspend all privileges.  Hedgpeth Decl. ¶

19  23.

20  **IV.    MODIFIED PROGRAMS AT SVSP FACILITY B IN 2012**

21         The SVSP Warden implemented thirty modified programs in 2012.  Asuncion Decl. ¶ 83.

22  Facility B operated under nine modified programs in 2012.  Asuncion Decl. ¶ 83.  Two of these

23  modified programs lasted longer than thirty-six days.  Asuncion Decl. ¶ 83.  The remaining seven

24  modified programs lasted less than thirty-six days.  Asuncion Decl. ¶ 83.

25         During his time as SVSP Warden, Defendant Hedgpeth implemented eighteen modified

26  programs, fifteen of which were closed by June 30, 2012.  Hedgpeth Decl. ¶ 24.  The average

27  duration of these fifteen modified programs was 29.6 days.  Hedgpeth Decl. ¶ 24.

28         In 2012, Facility B housed approximately 1,100 inmates of all races and ethnicities.

United States District Court
Northern District of California

Asuncion Decl. ¶ 84; Hedgpeth Decl. ¶ 25.  From 10:00 p.m. to 6:00 a.m., referred to as first-watch, Facility B had nine custodial staff members on duty.  From 6:00 a.m. to 2:00 p.m., referred to as second-watch, Facility B had twenty-eight custodial staff-members on duty.  From 2:00 p.m. to 10:00 p.m., referred to as third watch, there were twenty-three custodial staff-members on duty. Asuncion Decl. ¶ 84; Hedgpeth Decl. ¶ 25.  Neither Defendant Hedgpeth nor Defendant Asuncion had the authority to increase the number of custodial staff members assigned to Facility B. Asuncion Decl. ¶ 84; Hedgpeth Decl. ¶ 25.

On May 11, 2012, Plaintiff was subject to two modified programs, identified as Program Status Report Log No. SVSP-FB-12-008 ("Modified Program 8") and Program Status Report Log No. SVSP-FB-12-016 ("Modified Program 16").

### F.    Modified Program 8

Facility B had just returned to normal programming on February 9, 2012.  Asuncion Decl. ¶ 47; Hedgpeth Decl. ¶ 52.  On the next day, February 10, 2012, fourteen Black inmates attacked Northern Hispanic inmates during the morning-meal release.  Asuncion Decl. ¶ 47; Hedgpeth Decl. ¶ 52.  Two Northern Hispanics sustained wounds during the riot.  Asuncion Decl. ¶ 47; Hedgpeth Decl. ¶ 52.  The fourteen Black inmates who started the riot consisted of inmates who were nonaffiliated, and of inmates of different gang affiliations.  Asuncion Decl. ¶ 34.  Sgt. Valdez concluded that, based on his experience, this riot demonstrated the long-standing feud between Black inmates and Northern Hispanic inmates.  Valdez Decl. ¶¶ 29–31.

In response, staff placed Facility B on Modified Program 8 starting on February 10, 2012. Hedgpeth Decl. ¶ 52; Asuncion Decl. ¶ 16.  The record does not contain the program status report that implemented Modified Program 8.

On May 11, 2012, a program status report indicated that Modified Program 8 affected all black and Northern Hispanic inmates.  As of that date, there was not a total suspension of all privileges.  Black and Northern Hispanics were allowed access to the yard, but on separate days; canteen, packages, and phone call privileges were allowed "as needed;" and contact visiting was allowed but Black and Northern Hispanics were allowed contact only in visiting rooms.  ECF No. 22-11 at 22.

United States District Court
Northern District of California

Staff concurrently investigated the events that triggered both Modified Program 8 and Modified Program 16.  Asuncion Decl. ¶ 48; Hedgpeth Decl. ¶ 53.  By May 21, 2012, staff completed approximately 629 inmate interviews; completed a facility-wide search; and subjected mattresses, the yard, and inmates to metal detector searches.  Asuncion Decl. ¶¶ 42, 48; Hedgpeth Decl. ¶¶ 48, 52.

During the week of June 3, 2012, the Investigative Services Unit ("ISU") and the Institutional Gang Investigation Unit ("IGI") monitored mail and monitored the nonaffected inmates' telephone conversations for intelligence.  Asuncion Decl. ¶ 49; Hedgpeth Decl. ¶ 54.  Staff learned about a potential threat of violence between the Northern Hispanics and the Black inmates associated with the "Damu Blood" disruptive group.  Asuncion Decl. ¶ 49; Hedgpeth Decl. ¶ 54.  In response, on June 5, 2012, all Facility B inmates were placed back on Modified Program 8 pending searches and the completion of an investigation into the threat.  ECF No. 22-11 at 5.  All privileges were suspended, including yard, canteen, packages, and phone call, except for the following two exceptions: non-Northern Hispanic inmates could continue working as critical workers, and normal visiting was allowed.  ECF No. 22-11 at 5.

To gather additional information about potential threats, staff provided the Inmate Advisory Council ("IAC") with unrestricted access to all housing units to talk to inmates and report their findings to staff.  The IAC is a group of inmates elected by other inmates and IAC members often have some influence over other inmates.  IAC members spoke to inmates about any known security threats between inmate groups.  Visitation privileges were restored.  Black inmates and Northern Hispanic inmates participated in the contact-visitation program together and without incident.  Staff decided to begin incremental releases of inmates.  Asuncion Decl. ¶ 49; Hedgpeth Decl. ¶ 54.

On June 7, 2012, staff began incremental release of inmates. Asuncion Decl. ¶ 50; Hedgpeth Decl. ¶ 55.  Two inmates from each group, Blacks and Northern Hispanics, were released from each housing unit.  Asuncion Decl. ¶ 50; Hedgpeth Decl. ¶ 55.  Additional inmates were incrementally released on June 8, 2012.  Asuncion Decl. ¶ 50; Hedgpeth Decl. ¶ 55.  All Facility B inmates remained on Modified Program 8, but Modified Program 8 was updated to

United States District Court
Northern District of California

1    allow for incremental release to the yard; and as-needed canteen and packages privileges.  ECF

2    No. 22-11 at 3.  Phone call privileges were still barred, and inmates who were considered critical

3    workers could report to their jobs, with the exception of Black and Northern Hispanic inmates.

4          On June 14, 2012, the rotational-yard program commenced and all inmates participated.

5    Asuncion Decl. ¶ 51; Hedgpeth Decl. ¶ 56; ECF No. 22-10 at 18.  Due to the success of the

6    incremental release of inmates, the yard returned to normal programming that day.  Asuncion

7    Decl. ¶ 50; Hedgpeth Decl. ¶ 56; ECF No. 22-10 at 18.  Modified Program 8 was updated to allow

8    for normal yard, canteen, packages, and visiting privileges.  ECF 22-10 at 18.

9          On that same day, two inmates affiliated with the Crips engaged in a fight.  Asuncion Decl.

10   ¶ 50; Hedgpeth Decl. ¶ 56.  But there was no program modification because of this incident.

11   Asuncion Decl. ¶ 50; Hedgpeth Decl. ¶ 56; ECF No. 22-10 at 17.

12         On June 19, 2012, thirty-nine Black inmates and twenty-three Northern Hispanics rioted in

13   Facility B.  Asuncion Decl. ¶ 52; Hedgpeth Decl. ¶ 57; Valdez Decl. ¶ 33.  Staff initially placed

14   Black and Northern Hispanic inmates on Modified Program 8 with all privileges suspended.  ECF

15   No. 22-10 at 14.  The next day Modified Program 8 was updated to apply to all Facility B inmates

16   because of the magnitude of the incident.  Asuncion Decl. ¶ 52; Hedgpeth Decl. ¶ 57.  Black and

17   Northern Hispanic inmates continued to be denied all privileges, while White, Southern Hispanics,

18   and Other inmates were allowed normal movement, rather than movement in restraints; and were

19   allowed normal visits.  ECF No. 22-10 at 13.

20         On June 26, 2012, Modified Program 8 was narrowed to only affect the Northern Hispanic

21   disruptive group and Black inmates due to the tensions between the two groups.  ECF No. 22-10 at

22   9.  All privileges were denied.  ECF No. 22-10 at 9.

23         Staff interviewed all inmates involved in the riot, but did not obtain any new intelligence

24   or learn the cause of the riot.  Asuncion Decl. ¶ 53.

25         On July 12, 2012, staff restored non-contact visitation privileges, modified canteen-draw,

26   and modified packages.  Asuncion Decl. ¶ 54; ECF No. 22-9 at 16.

27         On August 1, 2012, staff commenced a facility-wide search.  Asuncion Decl. ¶¶ 55, 56.

28         On or about August 19, 2012, all inmates were placed on modified program to facilitate

United States District Court
Northern District of California

13

1  inmate-interviews.  Asuncion Decl. ¶ 57.  This modified program allowed for modified canteen

2  draw; modified packages; normal visiting for White, Other, and Southern Hispanic inmates; non-

3  contact visits for Black and Northern Hispanic inmates; controlled movement for White, Other,

4  and Southern Hispanic inmates; and escorted movement in restraints for Black and Northern

5  Hispanic inmates preceded by an unclothed body search and metal detector.  ECF No. 22-9 at 4.

6  All inmates were interviewed, except for eleven inmates that refused to participate.  Asuncion

7  Decl. ¶ 57.  The interviews did not reveal any intelligence or information regarding the continued

8  tension between Black inmates and Northern Hispanic inmates.  Asuncion Decl. ¶ 57.  That same

9  day, staff received information from confidential sources, revealing that there was ongoing tension

10  between Black inmates and Northern Hispanic inmates.  Asuncion Decl. ¶ 58.

11       Following the interviews, on or around August 22, 2012, staff restored contact-visitation

12  privileges to Black inmates and Northern Hispanic inmates and increased canteen privileges.

13  Asuncion Decl. ¶ 59; ECF No. 22-8 at 10.  Staff also interviewed the IAC and general-population

14  inmates for information regarding the continued tension between Black inmates and Northern

15  Hispanic inmates, but received no new intelligence.  Asuncion Decl. ¶ 59.

16       In an effort to return to normal programming, incremental releases began on August 28,

17  2012.  Asuncion Decl. ¶ 60; ECF No. 22-8 at 5.  Almost immediately there was an incident

18  between two Southern Hispanics and two Northern Hispanics.  Asuncion Decl. ¶ 60; Valdez Decl.

19  ¶ 33.  Staff determined that the Southern Hispanics were the aggressors and placed the Southern

20  Hispanics in a separate modified program.  Asuncion Decl. ¶ 60; ECF No. 22-8 at 4.  Later that

21  same day, there was a fight between two Black inmates and two Northern Hispanic inmates.

22  Asuncion Decl. ¶ 60; ECF No. 22-8 at 3.  They refused to comply with orders to stop fighting and

23  chemical weapons had to be used to stop the fight.  Asuncion Decl. ¶ 60.  One weapon was found

24  in the immediate area of the riot.  Asuncion Decl. ¶ 60.  That same day, staff placed all Facility B

25  inmates back on Modified Program 8 which allowed for modified canteen draw; modified

26  packages; normal visiting for White, Other, and Southern Hispanic inmates; non-contact visits for

27  Black and Northern Hispanic inmates; controlled movement for White, Other, and Southern

28  Hispanic inmates; and escorted movement in restraints for Black and Northern Hispanic inmates

14

preceded by an unclothed body search and metal detector.  ECF No. 22-8 at 4.

On August 29, staff returned White, Other, and Southern Hispanic inmates to normal programming; suspended the incremental release of Black inmates and Northern Hispanics; and returned Black inmates and Northern Hispanics to Modified Program 8 with all privileges suspended.  Asuncion Decl. ¶ 60; ECF No. 22-8 at 3.

On August 29, 2012, staff interviewed the Northern Hispanic inmates involved in the August 28, 2012 riot.  Asuncion Decl. ¶ 61.  Both inmates stated that they had no personal reason to engage in the fight; that they "had to do" what they "had to do;" and that they were new to the yard and only knew that there was a "war between the Northern Hispanic and Black inmates on Facility B."  Asuncion Decl. ¶ 61.  From these statements, staff concluded that inmates were being pressured by gangs to participate in the violence.  Asuncion Decl. ¶ 61. That same day, staff returned the White inmates and Other inmates to a normal program.   Asuncion Decl. ¶ 62.

On September 15, 2012, a non-affiliated Black inmate stated that he could "walk" with a Northern Hispanic but warned that the issues between the Northern Hispanic inmates and Black inmates were "ongoing" and that some of the inmates "can't let it go."  Asuncion Decl. ¶ 63.  He opined that the only way to resolve the violence between the Northern Hispanic inmates and Black inmates would be to replace all Facility B Northern Hispanic inmates with Northern Hispanic inmates that were currently housed elsewhere.  Asuncion Decl. ¶ 63.  From these statements, staff concluded that the Northern Hispanics perceived the conflict to be with all Black inmates, and not just Black inmates affiliated with gangs; and that all Black inmates, regardless of whether they affiliated with a disruptive group, were potentially at risk of being attacked.  Asuncion Decl. ¶ 63.

On September 20, 2012, during one interview, a Black inmate opined that there could be no resolution between Black inmates and Northern Hispanic inmates.  Asuncion Decl. ¶ 64.  This inmate stated that the August 28, 2012 riot between Northern Hispanics inmates and Black inmates was a Blood-affiliated incident.  Asuncion Decl. ¶ 64.  He further stated that Crips and non-affiliated Blacks were forced to assist or they would be in "trouble."  Asuncion Decl. ¶ 64.  From these statements, staff concluded that all Black inmates in the facility were at risk of becoming involved in the conflict between the Northern Hispanics and Black inmates, whether

United States District Court
Northern District of California

1  voluntarily or due to coercion.  Asuncion Decl. ¶ 64.

2      In an effort to return to normal programming, Black inmates and Northern Hispanic

3  inmates were provided non-contact-visitation privileges during the weekends of September 22–23,

4  2012 and September 29–30, 2012.  Asuncion Decl. ¶ 65; ECF No. 22-7 at 1, 3–7.  On October 2,

5  2012, modified canteen privileges and as-needed package privileges were also restored for Black

6  inmates and Northern Hispanic inmates.  ECF No. 22-6 at 19.

7      On October 4, 2012, staff met with IAC members to discuss the current modified program

8  and plans to initiate incremental release following completion of the inmate interviews.  IAC

9  members sought permission to walk the housing units and to talk to inmates before the

10  incremental releases began.  That same day, a nonaffiliated Black inmate stated during an

11  interview that he was selected to speak on behalf of the Black-inmate population.  He stated that

12  the Northern Hispanic and Black inmates should have separate yards, and that while Black

13  inmates were not the aggressors, they would defend themselves if attacked by Northern Hispanic

14  inmates.  From these statements, staff concluded that the conflict involved all Black inmates in the

15  facility, and not just Black inmates affiliated with gangs.  Asuncion Decl. ¶ 67.  As a result, all

16  inmates were placed back on Modified Program 8 to facilitate mass inmate-interviews and cell-

17  searches.   This updated Modified Program 8 suspended all privileges except the following:  White

18  and Other inmates were allowed normal visiting; Black inmates, Northern Hispanic inmates, and

19  Southern Hispanic inmates and their affiliates were allowed only non-contact visiting; and White

20  and Other inmates who served as critical workers were allowed to work.  ECF No. 22-6 at 17.

21      On or about October 7, 2012, staff met with IAC members to determine the tension-level

22  between Black inmates and Northern Hispanic inmates.  IAC members sought permission to walk

23  the housing units and to talk to inmates before the incremental releases began.  Asuncion Decl. ¶

24  68.

25      On October 11, 2012, Modified Program 8 was updated to allow canteen and packages

26  privileges for critical workers.  ECF No. 22-6 at 12.

27      On or about October 14, 2012, staff met again with IAC members.  Asuncion Decl. ¶ 68.

28      On or about October 18, 2012, contact-visitation privileges, canteen-draw, and packages

16

1   were restored to Black inmates and Northern Hispanic inmates.  Asuncion Decl. ¶¶ 70, 73; ECF

2   No. 22-6 at 4–6.  Southern Hispanic inmates and their affiliates remained restricted to no-contact

3   visits.  ECF No. 22-6 at 4–6

4        On or about October 23, 2012, White inmates and Other inmates were returned to normal

5   programming.  Asuncion Decl. ¶ 69; ECF No. 22-6 at 1–4.  Black inmates and Northern Hispanic

6   inmates remained on modified program with modified-canteen privileges, as-available package

7   privileges, and contact visits.  ECF No. 22-6 at 4.

8        On November 2, 2012, Defendant Asuncion interviewed two Black inmates.  One inmate

9   stated that he had been housed in Facility B for many years.  He stated that Black inmates were

10  ready to program and willing to participate in incremental releases.  He further stated that the

11  Black inmates would not participate in violence, other than self-defense, against the Northern

12  Hispanics or any other groups.  The other inmates stated that the Black inmates are "tired" of the

13  modified program and would not initiate any violence if returned to a normal program.  Asuncion

14  Decl. ¶ 71.

15       On November 5, 2012, staff received information from a confidential informant who

16  revealed that the Black-inmate population was required to attack Northern Hispanics "on sight."

17  The confidential informant was a Black inmate who was affiliated with the Crips street-gang, and

18  who requested placement in the Sensitive Needs Yard.  Asuncion Decl. ¶ 72.  No updates were

19  made to Modified Program 8.

20       On November 30, 2012, staff coordinated a meeting in the mental-health annex between

21  two influential Black inmates and two influential Northern Hispanic inmates in an attempt to

22  address the ongoing conflict.  Asuncion Decl. ¶ 74.  Staff agreed to facilitate additional meetings

23  between the two groups within the week.  Asuncion Decl. ¶ 74.

24       On December 6, 2012, staff permitted ten Black inmates and ten Northern Hispanic

25  inmates, while restrained, to talk to each other in an effort to resolve the tension between the Black

26  inmates and the Northern Hispanics.  Asuncion Decl. ¶ 75.  Following this meeting, staff

27  interviewed the Black and Northern Hispanic inmate populations, and both groups stated that they

28  were willing to program together safely.  Asuncion Decl. ¶ 75.

United States District Court
Northern District of California

17

1    In response to these successful meetings between influential inmate-representatives, an

2    incremental release plan was recommended with a start date of December 11, 2012.  However,

3    prior to that date, weapons and weapon-stock were discovered in the dining hall, leading to the

4    suspension of the incremental-release plan and the placement of all inmates on a separate modified

5    program (PSR SVSP-B-12-030) pending cell-searches and administrative review.  Asuncion Decl.

6    ¶ 76; ECF No. 22-4 at 8.  Staff initiated mass interviews of all inmates and commenced facility-

7    wide cell searches.  No new intelligence was obtained from the investigation so staff decided to

8    proceed with the incremental release plan.  Asuncion Decl. ¶ 76.

9    On January 3, 2013, staff commenced the incremental release plan, releasing two inmates

10   from the Black inmate group and the Northern Hispanics inmate group each time.  Asuncion Decl.

11   ¶ 77; ECF No. 22-3 at 17.  Only inmates with a threat-assessment score of five or less were

12   eligible for incremental release.  Asuncion Decl. ¶ 77.  Because the incremental releases were

13   successful, on January 10, 2013, staff increased the number of inmates released to six inmates

14   from each group at a time.  ECF No. 22-3 at 12.  On January 16, 2013, eight inmates from each

15   group were released at a time.  Asuncion Decl. ¶ 78.  Staff recommended incrementally releasing

16   the Southern Hispanics.  On January 16, 2013, eight inmates from the Black inmate group, the

17   Northern Hispanic inmate group, and the Southern Hispanic inmate group were released to the

18   yard.  ECF No. 22-3 at 8.  On January 22, 2013, staff released sixteen inmates from each group to

19   the yard without a violent incident.  ECF No. 22-3 at 5.  Staff recommended that on February 5,

20   2013, the facility return to regular program with continued cell-feeding and continued suspension

21   of dayroom activities.  Asuncion Decl. ¶ 79.  These limitations would allow staff to monitor

22   inmates' yard activities and ensure a safe return to a regular program.  Asuncion Decl. ¶ 79.

23   On February 5, 2013, Facility B returned to a normal yard program.  Asuncion Decl. ¶ 80;

24   ECF No. 22-2 at 15.  However, Facility B continued cell feeding, no dayrooms, and scheduled

25   shower days.  ECF No. 22-2 at 15.

26   On February 7, 2013, an incident occurred and staff discovered weapons in the dining hall.

27   Asuncion Decl. ¶ 80.  The normal-yard program was suspended and Black and Norteño inmates

28   were placed on a modified program to facilitate a facility-wide search.  Asuncion Decl. ¶ 80; ECF

United States District Court
Northern District of California

18

No. 22-2 at 12.  Dayroom and yard privileges were suspended; canteen and package privileges were modified; religious services were modified; and all movement was escorted.  Regular visiting was allowed.  ECF No. 22-2 at 12.  Staff discovered two cellular phones and minor contraband during the Facility B search, Asuncion Decl. ¶ 80, and in response, on February 11, 2012, Modified Program 8 was updated to include all Facility B inmates.  ECF No. 22-2 at 11.  On February 12, 2012, Modified Program 8 was updated to return all Facility B inmates, except for Black and Norteño inmates, to normal programming.  ECF No. 22-2 at 10.  However, at this time, PSR SVSP-B-12-002 was initiated and affected all inmate populations to facilitate mass searches in Facility B.

On February 20, 2013, following the Facility B search, Facility B resumed a normal yard program.  Asuncion Decl. ¶ 80; ECF No. 22-2 at 4.

On February 23, 2013, two incidents occurred that were unrelated to Modified Program 8.  Asuncion Decl. ¶ 81.  One incident involved two Black inmates.  The other incident involved two Southern Hispanic inmates.  Asuncion Decl. ¶ 81.

On February 25, 2013, Modified Program 8 was closed.  Asuncion Decl. ¶ 82; ECF No. 22-2 at 2.

## G.      Modified Program 16

Modified Program 16 began on May 11, 2012 in response to an anonymous note was received in the SVSP Facility B2 mailbag that stated that, as soon as the facility returned to a normal program, four Black inmates in housing unit B2 were planning to kill Correctional Officer Holland, who was assigned to Facility B at the time.  Asuncion Decl. ¶ 35; Hedgpeth Decl. ¶ 41; Valdez Decl. ¶ 34.  The note stated, "I am giving you this info[rmation] because I want out [of] this plan that I was forced into by certain people."  "I want out!"  "The only way is by doing this."  Asuncion Decl. ¶ 35; Hedgpeth Decl. ¶ 43; Valdez Decl. ¶ 34.  The note identified three inmates by nicknames and one inmate by a cell number.  Asuncion Dec. ¶ 37; Hedgpeth Decl. ¶ 41; Valdez Decl. ¶ 34.  The note specified that the inmates had weapons in their "paperwork" and had "cell phones."  Asuncion Dec. ¶ 37; Hedgpeth Decl. ¶ 43; Valdez Decl. ¶ 34.  The note stated that there was to be a "conference call on Monday" and that there was a written plan-of-attack.  Asuncion

Dec. ¶ 37; Hedgpeth Decl. ¶ 43; Valdez Decl. ¶ 34.  Both Defendant Hedgpeth and Defendant Asuncion considered this to be a real threat because they were aware of similar past inmate conspiracies to attack or kill officers that had been carried out with some degree of success. Asuncion Decl. ¶ 36; Hedgpeth Decl. ¶ 42.

Sgt. Valdez reviewed the anonymous note and understood that three of the four inmates were identified by nicknames.  Valdez Decl. ¶ 36.  According to SVSP records, these three inmates had no known gang affiliation.  Valdez Decl. ¶ 36.  The fourth inmate was identified by his cell assignment.  Valdez Decl. ¶ 36.  There were two inmates assigned to this cell, both affiliated with the Crips, and no way to determine who was the fourth coconspirator.  Valdez Decl. ¶ 36.  The note was apparently written by a fifth coconspirator.  Valdez Decl. ¶ 36.

That same day, an investigation was commenced regarding the note and all Black inmates were placed on modified program to facilitate a complete investigation and prevent the killing of Officer Holland.  Asuncion Dec. ¶ 37; Hedgpeth Decl. ¶ 44.  Modified Program 16 affected 438 Black inmates.  Asuncion Decl. ¶ 45.  Although Modified Program 8 was in effect at that particular time, a separate modified program was deemed necessary in case Modified Program 8 was closed or vacated prior to the conclusion of the investigation into the plan to kill Officer Holland.  Asuncion Dec. ¶ 38; Hedgpeth Decl. ¶ 44.  Modified Program 16 suspended all dayroom, yard, canteen, packages, and visiting privileges; required in-cell worship; required cell-feeding; and required all movement to escorted in restraints with an unclothed body search prior to escort.  ECF No. 22-1 at 3–14.

SVSP officials deemed it necessary to place all Black inmates on a modified program for the following reasons:

- SVSP officials were concerned that there were additional inmates involved in the plan to kill Officer Holland.

- The inmates identified in the notes were comprised of nonaffiliated and inmates affiliated with the Crips.

- When searching one of the cells identified in the anonymous note, staff observed two inmates attempting to flush inmate-notes and a cellular phone down the toilet. These two inmates were affiliated with a street-gang primarily consisting of Black individuals.

- In both Defendant Asuncion's experience and Sgt. Valdez's experience, when inmates carried out coordinated and planned attacks on correctional officers for no apparent reason, these inmates would typically be carrying out orders from a prison gang or disruptive group, often under coercion. This appeared to be the case here where there was no identified reason for targeting Officer Holland and the author of the anonymous note stated that he had been coerced into participating in the plot to kill Officer Holland. Defendant Asuncion was concerned that if only the inmates identified in the anonymous note were placed on modified program and Modified Program 8 was closed, the gang that had ordered Officer Holland's death would simply pressure other affiliated or nonaffiliated Black inmates to carry out the planned murder.

Asuncion Dec. ¶¶ 38–40; Hedgpeth Decl. ¶¶ 44–46.

On May 15, 2012, an inmate in another housing facility reported to staff that he had heard Black inmates housed in Administrative Segregation make threatening statements about Facility B staff members about two weeks prior to when the anonymous note was found. Asuncion Decl. ¶ 41; Hedgpeth Decl. ¶ 47. The inmate reported that he heard one inmate state, "The Facility B staff stand around acting hard," and another inmate state: "Yeah one of them needs to die." Asuncion Decl. ¶ 41; Hedgpeth Decl. ¶ 47.

On May 17, 2012, approximately 200 inmate-interviews were completed. During the week of May 21, 2012, approximately 429 inmate-interviews were completed. Staff searched housing units B1, B2, B3, and B5, and the facility program buildings. Mattresses, the yard, and inmates were subjected to metal detector searches. A review of the central-files of the inmates identified in the note indicated no history of staff assaults or threats. Inmate-interviews, searches, and investigation revealed no evidence to substantiate the threat against Officer Holland. Asuncion Decl. ¶ 42; Hedgpeth Decl. ¶ 48.

Staff compared the May 11, 2012 anonymous note to an April 30, 2012 anonymous note that had also been received in Facility B that contained detailed allegations that six Southern Hispanic inmates planned to assault staff. Staff concluded that the two notes might have been written by the same person. Asuncion Decl. ¶ 43; Hedgpeth Decl. ¶ 49. Officer Holland was interviewed as part of the investigation. Asuncion Decl. ¶ 44; Hedgpeth Decl. ¶ 50. Officer Holland stated that he harbored no fear of attack and opined that another group may have drafted the anonymous note to create problems for the Black population. Asuncion Decl. ¶ 44; Hedgpeth Decl. ¶ 50.

21

1    On May 29, 2012, Defendant Asuncion submitted a threat-assessment report

2    recommending that Modified Program 16 be closed.  Asuncion Decl. ¶ 45; Hedgpeth Decl. ¶ 51.

3    In accordance with that recommendation, Modified Program 16 was closed on May 30, 2012.

**DISCUSSION**

**I.    STANDARD OF REVIEW**

6    Summary judgment is proper where the pleadings, discovery and affidavits show there is

7    "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

8    law."  See Fed. R. Civ. P. 56(a) (2014).  Material facts are those that may affect the outcome of the

9    case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material

10   fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

11   nonmoving party.  See id.

12   A court shall grant summary judgment "against a party who fails to make a showing

13   sufficient to establish the existence of an element essential to that party's case, and on which that

14   party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an

15   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

16   See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial

17   burden of identifying those portions of the record that demonstrate the absence of a genuine issue

18   of material fact.  Id.  The burden then shifts to the nonmoving party to "go beyond the pleadings

19   and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

20   file, 'designate 'specific facts showing that there is a genuine issue for trial.'"  See id. at 324

21   (citing Fed. R. Civ. P. 56(e)).

22   For purposes of summary judgment, the court must view the evidence in the light most

23   favorable to the nonmoving party; if the evidence produced by the moving party conflicts with

24   evidence produced by the nonmoving party, the court must assume the truth of the evidence

25   submitted by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir.

26   1999). The court's function on a summary judgment motion is not to make credibility

27   determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W.

28   Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.     LEGAL STANDARD

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)). "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." Wolff v. McDonnell, 418 U.S. 539, 556 (1974) (citation omitted).  Invidious racial discrimination such as racial segregation, which is unconstitutional outside prisons, also is unconstitutional within prisons.  See Johnson v. California, 543 U.S. 499, 505–06 (2005).  While race-based classifications in prisons are not *per se* unconstitutional, such classifications are immediately suspect and subject to strict scrutiny.  See id. at 508–10.  Prison officials must therefore demonstrate that the race-based policy or action is narrowly tailored to serve a compelling state interest such as prison security.  See id. at 510–13, 515 (remanding case for determination of whether CDC's policy of temporarily segregating inmates by race when they arrive in the prison system initially or are transferred to a new prison is narrowly tailored to serve a compelling state interest).  In an equal protection claim based on racial discrimination, "the defendants ha[ve] to show that reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals)." Richardson v. Runnels, 594 F.3d 666, 671 (9th Cir. 2010).

## III.    ANALYSIS

Here, it is undisputed that on May 11, 2012, Plaintiff was subject to two modified programs, Modified Program 8 and Modified Program 16, because these modified programs affected all Black inmates housed in SVSP Facility B, which includes Plaintiff.  Plaintiff was not placed on these modified programs because of any actions taken by Plaintiff.  Defendants may succeed on summary judgment only if the undisputed evidence shows that the decisions to place Plaintiff on Modified Program 8 and Modified Program 16 were "narrowly tailored measures that

further[ed] compelling governmental interests." <u>Johnson</u>, 543 U.S. at 505.[6]

Our cases make plain – and Plaintiff does not dispute – that prison security is a compelling governmental interest.  <u>Greene v. Solano County Jail</u>, 513 F.3d 982, 988 (9th Cir. 2008) ("Prison security is a compelling governmental interest") (citing <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 725 n.15 (2005)); <u>see also</u> <u>Johnson</u>, 543 U.S. at 512 ("necessities of prison security and discipline are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities.") (internal quotation marks and citation omitted).  The record supports Defendants' argument that the challenged actions were directed toward promoting prison security.  Modified Program 8 was a response to the February 10, 2012 riot wherein fourteen Black inmates attacked Northern Hispanic inmates during the morning-meal release, Asuncion Decl. ¶ 47; Hedgpeth Decl. ¶ 52, and Modified Program 16 was a response to an anonymous note that described in great detail a plan to kill Officer Holland, Asuncion Decl. ¶ 35; Hedgpeth Decl. ¶ 41; Valdez Decl. ¶ 34.

The question therefore is whether Modified Program 8 and Modified Program 16 were "narrowly tailored" to promote prison security.[7]

United States District Court
Northern District of California

---

[6] Plaintiff incorrectly argues that <u>Johnson v. California</u>, 543 U.S. 499 (2005); <u>Richardson v. Runnels</u>, 594 F.3d 666 (9th Cir. 2010); and <u>Walker v. Gomez</u>, 370 F.3d 969 (9th Cir. 2004) hold that it is "unconstitutional to discriminate against a prisoner on the basis of race or ethnicity." ECF No. 34 at 8.  Rather, in <u>Johnson</u>, the Supreme Court held that that while not all racial classifications violate the Equal Protection Clause, all racial classifications must be analyzed by a reviewing court under strict scrutiny.  <u>Johnson</u>, 543 U.S. at 505, 515.  The <u>Johnson</u> court acknowledged that "[p]risons are dangerous places, and the special circumstances they present may justify racial classifications in some contexts."  <u>Id.</u> at 515; <u>see also id.</u> ("The fact that strict scrutiny applies 'says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny.'") (quoting <u>Adarand Constructors, Inc. v. Peña</u>, 515 U.S. 200, 229–30 (1995)).  Similarly, in <u>Richardson</u>, the Ninth Circuit did not hold that all racial classifications were unconstitutional.  Rather, the Ninth Circuit interpreted <u>Johnson</u> as requiring defendants to show that "reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals)."  <u>Richardson</u>, 594 U.S. at 672.  In other words, a racial classification could be constitutional if it were a necessary response to a prison disturbance and the least restrictive alternative.  <u>Walker</u> is not instructive here because it is a pre-<u>Johnson</u> case and does not apply strict scrutiny to the challenged racial classification.  <u>Walker</u>, 370 F.3d at 974–75 (analyzing the racial classification pursuant to <u>Turner v. Safley</u>, 482 U.S. 78 (1987) which applies the less stringent standard of requiring that actions of prison officials be reasonably related to legitimate penological goals).

[7] Plaintiff also argues that Modified Programs 8 and 12 violated the following state regulations in

24

## H.      Modified Program 8

Modified Program 8 ran from February 10, 2012 to February 25, 2013.  Hedgpeth Decl. ¶ 52; Asuncion Decl. ¶¶ 16, 81; ECF No. 22-2 at 2.

### 1.      Modified Program 8:  February 10, 2012 to August 18, 2012

After carefully reviewing the record and the relevant caselaw, the Court concludes that Defendants have not made an evidentiary showing concerning the basis for regarding all Black inmates as a security risk from February 10, 2012 to August 18, 2012 that would compel the Court to enter judgment in Defendants' favor as a matter of law.  Defendants have reasoned that it was necessary to apply Modified Program 8 to all Black inmates during this time period for the following reasons:  There was an ongoing inter-racial feud between affiliated Black inmates and Northern Hispanic inmates.  ECF No. 21 at 31.   Non-affiliated Black inmates were at risk of violence, or would be coerced to commit violence, during the feud with the Northern Hispanic inmates.  Hedgpeth Decl. ¶¶ 36, 38; ECF No. 21 at 31.  At SVSP, gang leadership directly or indirectly order inmates to attack staff and other inmates.  Hedgpeth Decl. ¶ 36; ECF No. 21 at 31. During such inter-racial feuds between affiliated Black inmates and Northern Hispanics, unaffiliated Black inmates would be expected to participate in the feud or face retaliation by their own racial group.  Valdez Decl. ¶ 24.  Black inmates, whether affiliated or unaffiliated, were

---

the following ways.  First, Modified Programs 8 and 12 violated  CDCR's policy prohibiting racial discrimination, as set forth in Section 3004(c) of the California Code of Regulations, title 15. Second, neither CDCR regulations nor the CDCR DOM authorized the implementation of race-based modified programs or ordered the use of race in implementing modified programs.  ECF No. 34 at 9, 14.  A violation of a state regulation does not, by itself, support a § 1983 claim. Ybarra v. Bastian, 647 F.2d 891, 892 (9th Cir. 1981) ("Section 1983 protects against the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.' . . . . Violations of state law alone are insufficient [to state a Section 1983 claim].").  Also, if the CDCR regulations and the DOM do not prohibit considering race in implementing or modifying modified programs, race-based modified programs do not run afoul of the CDCR regulations or DOM.  Not every action must be specifically authorized by the CDCR regulations or DOM to be authorized.

Plaintiff further argues that these two modified programs violated the settlement agreement reached in Walker v. Gomez, 370 F.3d 969 (9th Cir. 2004).  The breach of a settlement agreement does not constitute a constitutional violation.  If Modified Programs 8 and 12 violate a settlement agreement, Plaintiff should consult the terms of the settlement agreement to determine how he should seek enforcement of the agreement, assuming that Plaintiff is a party to the settlement agreement.  There is nothing in the record that indicates that this Court has jurisdiction to enforce any settlement agreement entered in Walker v. Gomez.

United States District Court
Northern District of California

1    expected to help other Black inmates during group disturbances with inmates of other races.

2    Black inmates almost always set aside other conflicts to help other Black inmates during a group

3    disturbance or riot between different races.  Black inmates would typically physically assault

4    another Black inmate, whether affiliated or unaffiliated, who failed to "help" or participate during

5    a group disturbance with other races.  Valdez Decl. ¶ 15.  When feuds were taking place between

6    the Northern Hispanic and Black inmate populations, Hispanic inmates, whether by choice or

7    coercion, would sometimes attack Black inmates – affiliated or not – simply because they were

8    Black.  Such attacks would often be perceived by affiliated Black inmates as an attack on them

9    and their gang.  In response, affiliated Black inmates would often attack any Hispanic inmates in

10   retaliation.  Hedgpeth Decl. ¶ 38. The February 10, 2012 attack was carried out by fourteen Black

11   inmates, who were both affiliated and unaffiliated.  Asuncion Decl. ¶¶ 34, 47; Hedgpeth Decl. ¶

12   52.  A June 19, 2012 riot between thirty-nine Black inmates and twenty-three Northern Hispanic

13   inmates demonstrated inter-racial gang-related tensions between the Black inmates and Northern

14   Hispanics that subjected staff and all inmates – affiliated or not – to violence and possible injury.

15   Valdez Decl. ¶ 33; Asuncion Decl. ¶ 52; ECF No. 21 at 31.

16          Viewing all the inferences in Plaintiff's favor, the Court cannot say that Defendants'

17   conclusions are supported by the record.  Rather, many of these conclusions are simply assertions

18   by Defendants without evidentiary support.  "When the moving party also bears the burden of

19   persuasion at trial, to prevail on summary judgment it must show that 'the evidence is so powerful

20   that no reasonable jury would be free to disbelieve it.'" Shakur v. Schriro, 514 F.3d 878, 890 (9th

21   Cir. 2008) (quoting 11–56 Moore's Federal Practice–Civil § 56.13).  "[C]onclusory affidavits that

22   do not affirmatively show personal knowledge of specific facts are insufficient." Id.  For example,

23   Sgt. Valdez does not provide evidentiary support for his assertions that Black inmates prioritized

24   their racial identity for their gang affiliation; that unaffiliated inmates were coerced by gang

25   leadership into committing acts of violence; and that Black inmates were required to participate in

26   racial feuds.  These conclusory assertions are problematic in that they would justify placing all

27   Black inmates on a modified program anytime an incident involves both affiliated and unaffiliated

28   Black inmates without asking prisons to look more carefully at the number or percentage of

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1    unaffiliated Black inmates involved in the incident, or unaffiliated Black inmates' threat level

2    assessment or relationship with the affiliated Black inmates.  Defendants also fail to specify how

3    the February 10, 2012 riot indicated an inter-racial feud.  Defendants state that the fourteen Black

4    inmates participating in the riot consisted of both affiliated and unaffiliated inmates, but do not

5    specify how many of the fourteen inmates were unaffiliated, or address whether these unaffiliated

6    inmates had a history of violence or were otherwise connected to gangs or disruptive groups, such

7    as sharing a cell with an affiliated inmate.

8         Because Defendants have not made an evidentiary showing that all Black inmates were a

9    security risk from February 10, 2012 to August 18, 2012, they have failed to make an evidentiary

10   showing that Modified Program 8 was narrowly tailored to address prison security concerns.

11   Furthermore, the record indicates that Defendants did not commence inmate-interviews regarding

12   the February 10, 2012 riot that triggered Modified Program 8 until three months later, May 17,

13   2012; that Plaintiff is unaffiliated; and Plaintiff had no history of violence during his time at SVSP

14   Facility B, further calling into question whether Modified Program 8 was narrowly tailored.

15   Asuncion Decl. ¶¶ 22, 42, 48; Hedgpeth Decl. ¶¶ 23, 48, 53; ECF No. 34 at 5.  Accordingly, there

16   is a genuine issue of material fact as to whether placing all Black inmates on Modified Program 8

17   from February 10, 2012 to August 18, 2012 was the least-restrictive alternative.  See Rhinehart v.

18   Cate, No. 11-CV-00812-JST (PR), 2014 WL 573495, at *4 (N.D. Cal. Feb. 12, 2014) (finding that

19   prison officials failed to demonstrate narrow tailoring where, following unprovoked attack by

20   Black inmate on correctional officers and a Black Bloods inmate stabbing another Black Crips,

21   prisons placed on Black inmates even though inmate was unaffiliated and had never instigated a

22   violent incident) (also finding that prison officials' arguments that all Black inmates constituted a

23   security risk because inmates are coerced by gangs or disruptive groups to engage in violence, and

24   that it is difficult for prison officials to identify inmate's gang or disruptive group affiliation, if

25   any, were the kinds of generalization found insufficient in Richardson to demonstrate narrow

26   tailoring at summary judgment stage); Haynes v. Sisto, No. CIV S-08-2177-SPG (PC), 2012 WL

27   6005701, *8 (generalizations that all Black inmates posed a security risk because there had been

28   isolated incidents of violence perpetrated by Black inmates were the kinds of generalization found

27

United States District Court
Northern District of California

1   insufficient in <u>Richardson</u> to demonstrate narrow tailoring at summary judgment).  The Court

2   therefore DENIES Defendants' summary judgment motion with respect to Plaintiff's equal

3   protection claim regarding the application of Modified Program 8 to Plaintiff from February 10,

4   2012 to August 18, 2012.[8]

5         Defendants also argue that they are entitled to qualified immunity.  The defense of

6   qualified immunity protects "government officials . . . from liability for civil damages insofar as

7   their conduct does not violate clearly established statutory or constitutional rights of which a

8   reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The

9   threshold question in qualified immunity analysis is: "Taken in the light most favorable to the

10  party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

11  right?"  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  A court considering a claim of qualified

12  immunity must determine whether the plaintiff has alleged the deprivation of an actual

13  constitutional right and whether such right was "clearly established."  <u>Pearson v. Callahan</u>, 555

14  U.S. 223, 236 (2009).  The relevant, dispositive inquiry in determining whether a right is clearly

15  established is whether it would be clear to a reasonable officer that his conduct was unlawful in

16  the situation he confronted.  <u>Saucier</u>, 533 U.S. at 202.

17        The law that racial classifications are evaluated under strict scrutiny was clearly

18  established in 2012.  <u>See</u> <u>Johnson</u>, 543 U.S. at 505.  However, whether Defendants' actions were

19  reasonable depends on disputed factual issues regarding whether Defendants' actions were

20  narrowly tailored.  Thus, summary judgment is not appropriate.  <u>See</u> <u>Santos v. Gates</u>, 287 F.3d

21  846, 855 n.12 (9th Cir. 2002).  Accordingly, Defendants are not entitled to summary judgment

22  based on qualified immunity regarding the application of Modified Program 8 to Plaintiff from

23  February 10, 2012 to August 18, 2012.

            **2.      Modified Program 8:  August 19, 2012 to February 25, 2013**

24        Defendants have made an evidentiary showing that from August 19, 2012 to October 4,

25  2012, that there was a basis for considering all Black inmates a security threat, and that application

26

27  _____

    [8] As discussed *infra*, the Court GRANTS summary judgment in favor of Warden Hedgpeth with
28  respect to the application of Modified Program 8 to Plaintiff from July 1, 2012 to August 18,
    2012.

of Modified Program 8 to Black inmates during this time was narrowly tailored.  During this time period, inmates informed staff that all Black inmates — not just Black inmates affiliated with prison gangs or disruptive groups — were likely to engage in violence against Northern Hispanic inmates or were at risk for attack by Northern Hispanic inmates.  On August 19, 2012, staff received information two confidential sources that revealed on-going tension between Black inmates and Northern Hispanic inmates continued to exist.  Asuncion Decl. ¶ 58.  On August 29, 2012, the two Northern Hispanic inmates involved in the August 28, 2012 fight stated that they had no personal reason to engage in the August 28, 2012 fight, and only knew that there was a war between the Northern Hispanic and Black inmates on Facility B.  Asuncion Decl. ¶ 61.  On September 15, 2012, a non-affiliated Black inmate warned that the issues between the Northern Hispanic inmates and Black inmates were "ongoing" and that some of the inmates "can't let it go." Asuncion Decl. ¶ 63.  On September 20, 2012, during one interview, a Black inmate opined that there could be no resolution between Black inmates and Northern Hispanic inmates; and that although the August 28, 2012 riot was a Blood-affiliated incident, Crips and non-affiliated Blacks were forced to assist or they would be in "trouble."  Asuncion Decl. ¶ 64.  On October 4, 2012, an inmate alleged in an inmate interview that Black inmates would fight back if attacked by Northern Hispanic inmates.  ECF No. 22-6 at 3–17.  Prison staff also attempted to implement incremental releases and close out Modified Program 8 three times during this time period: during August 2012, December 2012, and January 2013.  Hedgpeth Decl. ¶ 55; Asuncion Decl. ¶¶ 50, 60, 76, 77; Valdez Decl. ¶ 33; ECF No. 22-8 at 5; ECF No. 22-4 at 8; ECF No. 22-3 at 5–17.  These incremental releases were suspended in response to an August 28, 2012 fight between two Black inmates and two Northern Hispanic inmates that required chemical weapons to end, Asuncion Decl. ¶¶ 52, 60; Hedgpeth Decl. ¶ 57; Valdez Decl. ¶ 33; ECF No. 22-8 at 4; to the October 4, 2012 inmate statement that Black inmates would fight back if attacked by Northern Hispanics, Asuncion Decl. ¶ 67; and in response to the discovery of weapon-stock in December 2012, Asuncion Decl. ¶ 76.  Throughout November 2012, staff coordinated meetings between Black inmates and Northern Hispanic inmates in an attempt to address the ongoing tension, and planned an incremental release starting December 11, 2012.  Asuncion Decl. ¶¶ 71–76.

Plaintiff does not dispute the above evidence, but proffers that during his time at SVSP Facility B, he was never involved in violence and never approached by other inmates to engage in violence. ECF No. 34 at 5. However, this assertion does not create a genuine issue for trial as to whether the application of Modified Program 8 to all Black inmates from August 19, 2012 to February 25, 2013, was the least restrictive alternative, given the specific and verified information provided to Defendants. Plaintiff argues that there are other, more narrowly tailored, methods to maintain prison security, such as individualized assessments. ECF No. 34-2 at 24. However, Plaintiff fails to address how individualized assessments would have been applicable when the information provided through inmate interviews, and confirmed by fights between Black inmates and Northern Hispanics, was that there was an ongoing feud between Northern Hispanic inmates and all Black inmates. Under the undisputed facts, reasonable people could not differ regarding the necessity applying Modified Program 8 to all Black from August 19, 2012 to February 25, 2013 in response to concerns of prison security and safety, and that this racial classification was the least restrictive alternative. Cf. Richardson, 594 F.3d at 671. Accordingly, the Court GRANTS Defendants' summary judgment motion with respect to Plaintiff's equal protection claim regarding the application of Modified Program 8 to Plaintiff from August 19, 2012 to February 25, 2013.[9]

   **I.      Modified Program 16**

Modified Program 16 ran from May 11, 2012 to May 30, 2012. Hedgpeth Decl. ¶¶ 41, 51; Asuncion Decl. ¶¶ 35, 45; Valdez Decl. ¶ 34.

Defendants have made an evidentiary showing that prison officials' decision to apply Modified Program 16 to all Black inmates was narrowly tailored. Defendants' concern that there was no way of narrowing down the group of Black inmates most likely to be involved in the plot to kill Officer Holland was based on specific facts, and not based on generalizations about loyalty among Blacks or coercion by gang leadership. The anonymous note identified three inmates by

---

[9] It is unnecessary to discuss whether Defendants are entitled to qualified immunity with respect to the application of Modified Program 8 to Plaintiff from August 19, 2012 to February 25, 2013 because the Court has granted summary judgment in favor of Defendants for this portion of Modified Program 8.

nicknames and one inmate by a cell number.  Asuncion Dec. ¶ 37; Hedgpeth Decl. ¶ 41; Valdez Decl. ¶ 34.  Three of the four inmates had no known gang affiliation.  Valdez Decl. ¶ 36.  The fourth inmate was identified by his cell assignment.  Valdez Decl. ¶ 36.  There were two inmates assigned to this cell, both affiliated with the Crips, and no way to determine who was the fourth coconspirator.  Valdez Decl. ¶ 36.  When searching one of the cells identified in the anonymous note, staff observed two inmates attempting to flush inmate-notes and a cellular phone down the toilet.  These two inmates were affiliated with a street-gang primarily consisting of Black individuals.  Asuncion Dec. ¶¶ 38–40; Hedgpeth Decl. ¶¶ 44–46.  A week after the note was discovered, an inmate in another housing facility reported to staff that he had heard Black inmates housed in Administrative Segregation make threatening statements about Facility B staff members about two weeks prior to when the anonymous note was found.  Asuncion Decl. ¶ 41; Hedgpeth Decl. ¶ 47.  Here, prison officials relied on specific and recent information indicating that Black inmates were a threat to prison security; the information was seemingly confirmed by other events; a significant majority of the inmates who were identified as a threat were unaffiliated; and prison officials were unable to narrow down the Black inmates involved in the conspiracy.  In contrast with Modified Program, it is unclear how many of the inmates participating in the riot that triggered Modified Program 8 were unaffiliated, and prior to August 8, 2012, Defendants relied on generalized statements to justify their conclusion that an inter-racial feud was in existence.

In addition, the record indicates that Defendants worked quickly to investigate this security concern and return Black inmates to normal programming.  The week after the note was found, staff commenced inmate-interviews; cell and facility searches; and additional investigation.  Asuncion Decl. ¶ 42; Hedgpeth Decl. ¶ 48.  429 inmate interviews were completed within two weeks.  Asuncion Decl. ¶ 42; Hedgpeth Decl. ¶ 48.  A week after the completion of inmate-interviews, Defendant Asuncion submitted a threat-assessment report recommending that Modified Program 16 be closed, and the next day, in accordance with that recommendation, Modified Program 16 was closed.  Asuncion Decl. ¶ 45; Hedgpeth Decl. ¶ 51.  In contrast, Defendants waited three months before starting the inmate-interviews for Modified Program 8.

Plaintiff does not dispute the above evidence, but proffers that during his time at SVSP

31

Facility B, he was never involved in violence and never approached by other inmates to engage in violence. ECF No. 34 at 5. Plaintiff's assertion fails to create a genuine issue of material fact as to whether the application of Modified Program 16 was the least restrictive alternative. Defendants have presented undisputed evidence that they were informed the plot was driven by Black inmates, that the plot was primarily being executed by unaffiliated inmates, and that they were unable to narrow down the inmates potentially involved in the plot. In addition, Modified Program 16 lasted only three weeks. Under the undisputed facts, the Court finds that reasonable men and women could not differ regarding the necessity of applying Modified Program 16 to all Black inmates in response to their concern of prison security and safety. Richardson, 594 F.3d at 671. Accordingly, Defendants' motion for summary judgment as to Plaintiff's equal protection claim regarding Modified Program 16 is GRANTED.[10]

### J.     Defendant Hedgpeth

Defendants argue that Defendant Hedgpeth cannot be held liable for any time Plaintiff was affected by a modified program after Defendant Hedgpeth's June 30, 2012 retirement. The Court agrees. A plaintiff must show the defendant either personally participated in a deprivation of the plaintiff's rights, or cause such deprivation to occur. Starr v. Baca, 652 F.3d 1201, 1207 (9th Cir. 2011). Accordingly, the Court GRANTS summary judgment in favor of Defendant Hedgpeth with respect to the implementation of Modified Program 8 after June 30, 2012 but DENIES summary judgment with respect to the implementation of Modified Program 8 from February 10, 2012 to June 30, 2012.

### CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.     Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART. The Court GRANTS Defendants' summary judgment motion as to Plaintiff's equal protection claim regarding Modified Program 16, and in favor of Defendant Hedgpeth with

---

[10] Because the Court grants Defendants' motion for summary judgment as to Modified Program 16, it is unnecessary to discuss whether defendants are entitled to qualified immunity with respect to Modified Program 16.

respect to the implementation of Modified Program 8 after June 30, 2012.  The Court DENIES summary judgment with respect to the implementation of Modified Program 8 from February 10, 2012 to June 30, 2012 with respect to Defendant Hedgpeth, and with respect to the implementation of Modified Program 8 from February 10, 2012 to August 18, 2012 with respect to Defendant Asuncion and Sgt. Valdez.

2.      The case is hereby REFERRED to Magistrate Judge Vadas for settlement proceedings. Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Vadas's calendar will permit.  Magistrate Judge Vadas shall coordinate a place, time and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon.  The Clerk is directed to serve Magistrate Judge Vadas with a copy of this order and to notify Magistrate Judge Vadas that a copy of the Court file can be retrieved from the Court's electronic filing database.

3.      In view of the referral, further proceedings in this case are hereby STAYED and the case is ADMINISTRATIVELY CLOSED.  If the case is not settled, the Court will enter a new scheduling order for further proceedings.

This order terminates Docket No. 21.

IT IS SO ORDERED.

Dated:  March 30, 2017

_____
JON S. TIGAR
United States District Judge